IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NIAMA JOYNER, | : | CIVIL ACTION |
| o/b/o A.D.J.L., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL,[1] | : | |
| Acting Commissioner of Social Security, | : | |
| Defendant. | : | No. 16-0524 |

<u>REPORT AND RECOMMENDATION</u>

**LINDA K. CARACAPPA**
**UNITED STATES CHIEF MAGISTRATE JUDGE**

Plaintiff, Niama Joyner, on behalf of her daughter, A.D.J.L., brought this action under 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). Presently before this court are plaintiff's request for review, the Commissioner's response, and plaintiff's reply. For the reasons set forth below, we recommend plaintiff's request for review be GRANTED, and remand ordered.

I.      FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on October 28, 2008 and was three (3) years old on the alleged disability onset date. (Tr. 17).

On August 17, 2012, plaintiff's mother filed an application for SSI on plaintiff's behalf, alleging disability beginning April 1, 2012. (Tr. 127). This application was denied at the

---

1 Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

state level on November 15, 2012.  (Tr. 72).  Plaintiff's mother subsequently requested a hearing

before an Administrative Law Judge ("ALJ").  (Tr. 76).

              On May 28, 2014, ALJ Jay Marku held a hearing and heard testimony from

plaintiff's mother, who was present with counsel.  (Tr. 29).  The ALJ issued an opinion on June

17, 2014, finding plaintiff not disabled under the Act since August 17, 2012.  (Tr. 15-25).

Plaintiff's mother filed a request for review, and on December 3, 2015, the Appeals Council

denied the request for review, making the ALJ's decision the final decision of the Commissioner.

(Tr. 1).  Plaintiff's mother appealed that decision to this court.

II.     LEGAL STANDARDS

              Upon judicial review, this court's role is to determine whether an ALJ's decision

is supported by substantial evidence.  42 U.S.C. § 405(g); Pierce v. Underwood, 587 U.S. 552

(1988).  "Substantial evidence is more than a mere scintilla but may be somewhat less than a

preponderance of the evidence."  Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005).  It is

relevant evidence viewed objectively as adequate to support a decision.  Richardson v. Perales,

402 U.S. 389, 401 (1971).  In determining whether substantial evidence exists, the reviewing

court may not weigh the evidence or substitute its own conclusion for that of the ALJ.  Burns v.

Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  If the court determines the ALJ's factual findings

are supported by substantial evidence, the court must accept the findings as conclusive.

Richardson, 402 U.S. at 390; Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  It is the

ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the

relative weights to be given to the evidence.  Richardson, 402 U.S. at 401.  While the Third

Circuit Court of Appeals has made it clear that the ALJ must analyze all relevant evidence in the

record and provide an explanation for disregarding evidence, this requirement does not mandate

that the ALJ "use particular language or adhere to a particular format in conducting his analysis." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004). Rather, it is meant "to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Id. Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards. Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To establish a disability under the Act, an individual under the age of eighteen (18) must demonstrate he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The Commissioner must follow a three-step sequential analysis for determining childhood disability. 20 C.F.R. § 416.924. To establish disability the child must demonstrate: (i) he was not engaged in substantial gainful activity; (ii) he had a "severe" impairment or combination of impairments; and (iii) his impairment or combination of impairments met, medically equaled, or functionally equaled the severity of an impairment in the listings. See id. If the child has an impairment or combination of impairments that causes marked and severe limitations of function that meet, medically equal, or functionally equal a listed impairment, the regulations direct a finding of disabled. 20 C.F.R. § 416.924(d).

An impairment functionally equals listing level severity if the child can show "marked" limitations in two of the six domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). A "marked" limitation is one that "interferes seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). Such a limitation is "more than moderate" but "less than extreme." Id. A limitation that is "extreme" is one that interferes "very seriously" with the ability to independently initiate,

sustain, or complete activities.  20 C.F.R. § 416.926a(e)(3).  The six domains of functioning in which the child must demonstrate marked or extreme limitation are: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).

In considering a child's claim for disability, the ALJ considers all relevant evidence including medical evidence, test scores, school records, and information from people who know the child and can provide evidence about functioning, such as the child's parents, caregivers, and teachers.  See 20 C.F.R. § 416.924a.  When evaluating the effects of the child's impairments on his functioning, the Commissioner considers how the child's functioning compares to the functioning of children of the same age without impairments, the combined effects of multiple impairments, and how well the child can initiate, sustain, and complete activities.  20 C.F.R. § 416.924a(b).

III.    ADMINISTRATIVE LAW JUDGE'S DECISION

Pursuant to the three-step sequential evaluation process, the ALJ determined plaintiff had not been under a "disability," as defined by the Act, since August 17, 2012.  (Tr. 11-25).

At step one, the ALJ found plaintiff had not engaged in substantial gainful activity since August 17, 2012.  (Tr. 17).  At step two, the ALJ found plaintiff had one severe impairment: post-traumatic stress disorder.  Id.  In making this determination, the ALJ relied upon plaintiff's medical records.  The following summarized medical records pertain to the issues at bar:

On April 2, 2012, plaintiff was referred to Mary Abboud, MPE, M.S. Ed. at the

Children's Crisis Treatment Center due to exposure to severe chronic domestic violence between plaintiff's mother and father from 2008 to 2010. (Tr. 174). On June 30, 2010, during a physical altercation with plaintiff's father, plaintiff's mother accidentally shot plaintiff's father in the leg. Id. Plaintiff's mother was incarcerated for three (3) to four (4) weeks and was eventually acquitted of all changes. Id. Plaintiff witnessed her father put a gun to her mother's head, hit her mother with a frying pan, and tie a telephone cord around her mother's neck. Id. Plaintiff's mother now has a protection from abuse order against plaintiff's father, and plaintiff's father has weekly, court supervised visitations with plaintiff and her sister. Id. Plaintiff's mother reported plaintiff had severe temper tantrums, was physically aggressive toward her sister and protective of her mother, had difficulty separating from her mother and grandmother, overate, and had sleep disturbances. (Tr. 177). During a mental status examination, plaintiff presented as a sweet and outgoing girl who was appropriately dressed and groomed. Id. Plaintiff engaged in appropriate play with her older sister, had a full affect and normal mood, responded to all questions, and made good eye contact. Id. There was no evidence of a thought disorder, no reported history of hallucinations, and no history of suicidal or homicidal concern. Id. The diagnosis included chronic posttraumatic stress disorder (PTSD), exposure to severe, chronic domestic violence, and the loss of a twin brother in utero due to plaintiff's father's apparent domestic violence toward plaintiff's mother; plaintiff was assessed a global assessment of functioning (GAF)[2] score of 49. (Tr. 179). Recommendations included weekly trauma-focused treatment to help plaintiff cope with exposure to extensive domestic violence. (Tr. 180).

On April 23, 2012, plaintiff had a therapy appointment with Ms. Abboud; in the lobby, prior to the appointment, plaintiff was aggressive and appeared to be angry, but in session

---

2 GAF measures the psychological, social, and occupational functioning levels of an individual. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).

with Ms. Abboud, plaintiff presented with a full affect and normal mood.  (Tr. 302).  Plaintiff played with a dollhouse during the appointment, appeared comfortable, verbal, and moderately engaged, and struggled after the session managing her emotions safely.  Id.

On May 7, 2012, plaintiff met with Ms. Abboud and had a full affect and a "mad" mood; plaintiff played with Barbie dolls during the session, was cooperative and actively engaged, had a focused discussion, and continued to build the therapeutic relationship with Ms. Abboud.  (Tr. 304).

Plaintiff met with Ms. Abboud on May 16, 2012 and was focused with a full affect and a variable mood.  (Tr. 305).  Plaintiff stated she was "scared" of her father and her father "gets mad."  Id.  Plaintiff was startled by noises outside the door, and Ms. Abboud eventually opened the door so plaintiff could see she was safe and the noises were from people walking down the hallway.  Id.

On June 11, 2012, plaintiff met with Ms. Abboud and had a constricted affect and a variable mood.  (Tr. 306).  Plaintiff was engaged and verbal while reading a book.  Id.

On June 20, 2012, plaintiff met with Ms. Abboud and presented with a full affect and a variable mood; plaintiff was actively engaged in a focused discussion, and she stated her father "doesn't like" her anymore and was mean.  (Tr. 307).  At the end of the session, plaintiff balled up her fists, became upset, and initially refused to clean up, however, she quickly self-soothed and cleaned up to receive her stickers.  Id.

At an appointment with Ms. Abboud on June 25, 2012, plaintiff had a full affect and normal mood; she shared feelings of being scared at home and of upsetting her grandmother.  (Tr. 308).

Plaintiff met with Ms. Abboud on July 9, 2012 and had a full affect and normal

mood; plaintiff expresses herself in a tangential manner, so it was difficult for Ms. Abboud to understand plaintiff's statements.  (Tr. 309).  Plaintiff was actively engaged.  Id.

On July 16, 2012, plaintiff met with Ms. Abboud and had a full affect and normal mood; she engaged in narrative play with the dollhouse, and expressed the importance of quiet, calm, nurturance, and safety.  (Tr. 310).

On August 1, 2012, plaintiff met with Ms. Abboud and had a full affect and normal mood; they talked about the importance of safety and ways to manage big feelings such as anger or sadness.  (Tr. 311).

On September 7, 2012, plaintiff's mother completed a function report for "a child aged one to third birthday" and reported plaintiff did not have trouble seeing or hearing, was not totally unable to talk, did not have difficulty understanding, and did not have limited physical abilities.  (Tr. 138-41).  Plaintiff had impairments affecting her behavior with other people, such as an inability to play catch or simple games with other children, and plaintiff was affectionate towards her parents, said no a lot, and played next to children but not with them.  (Tr. 142). Plaintiff did not cooperate getting dressed or brushing her teeth, drank from a cup or glass without help, fed herself with a spoon, and could undress by herself.  Id.  Plaintiff's mother reported plaintiff hit, yelled, and could not stand still.  Id.

Plaintiff had an appointment with Ms. Abboud on September 10, 2012; Ms. Abboud acknowledged "daddy hurt mommy," and plaintiff responded "mommy did not shoot daddy and mommy did not go to jail."  (Tr. 315).

On September 24, 2012, plaintiff met with Ms. Abboud and had a full affect and variable mood; plaintiff engaged in play but appeared anxious and had difficulty sharing her thoughts and feelings.  (Tr. 317).

On October 3, 2012, plaintiff had an appointment with Ms. Abboud and used play to share her thoughts; plaintiff played with the dollhouse, and a girl doll needed to protect the mother figure.  (Tr. 318).

During a meeting with Ms. Abboud on October 19, 2012, plaintiff had a somewhat restricted affect, a variable mood, and she used play to express her thoughts.  (Tr. 319).  Plaintiff had a daughter doll save and protect a mother doll from injury; she later used police toys to handcuff Ms. Abboud and point a gun at Ms. Abboud's head and face, stating plaintiff's grandmother told plaintiff to "shoot everyone."  Id.  Plaintiff's mood later shifted, and plaintiff stated "I don't want to be the shooter . . . I am sad."  Id.  She hid under the table and only emerged when Ms. Abboud called her Lalaloopsy.  Id.

On November 1, 2012, Nicole Schwartz, Psy.D. completed a disability evaluation and noted plaintiff was well groomed and appropriately dressed; plaintiff's mother reported plaintiff had anger, saw a lot of trauma, could scream at the top of her lungs for up to forty (40) minutes, and had been diagnosed with PTSD.  (Tr. 230).  Dr. Schwartz noted plaintiff's day care reported plaintiff isolated herself at times, would yell at and push other children, and threw things.  (Tr. 231-32).  Academically, plaintiff was learning and making progress, but she could refuse to work and could engage in hyperactivity and impulsivity.  (Tr. 232).  Plaintiff can wash her face, brush her teeth, and get dressed independently; she loses things, has nightmares, and has a normal appetite.  Id.  When upset, plaintiff throws and breaks things, kicks, punches walls, doors, and people, cries, lies, steals, and engages in cruelty to animals (i.e. throws the cat down the stairs).  Id.  Plaintiff bullies other kids and her siblings.  Id.  With regard to social functioning, plaintiff does not have any friends and is aggressive toward others; she plays with mermaid toys and wants to be a girl when she grows up.  Id.  A mental status examination

8

showed plaintiff was well groomed, had good eye contact, responded well to questions, was alert and oriented, had calm motor behavior and unremarkable speech, and a normal mood and affect. (Tr. 233).  Plaintiff was able to state her ABCs, count to ten (10), and identify colors, shapes, animals, and vegetables.  Id.  The diagnosis was PTSD, a history of domestic violence, and a GAF score of 50, and it was recommended plaintiff continue meeting with her therapist weekly. (Tr. 233-34).

On November 1, 2012, Dr. Schwartz completed a Childhood Medical/Psychological Source Statement of Functional Abilities.  (Tr. 235).  With regard to the six domains of functioning, Dr. Schwartz opined the following: in the area of acquiring and using information, plaintiff was able to learn and retain information; with regard to attending and completing tasks, plaintiff could attend but may refuse to complete tasks; with regard to interacting and relating with others, Dr. Schwartz stated plaintiff tended to isolate herself and would become aggressive with peers; with regard to moving and manipulating objects, Dr. Schwartz opined plaintiff had no limitations; regarding caring for self, plaintiff had appropriate self-care skills for her age, and plaintiff may hurt others when she is upset; finally, regarding health and physical well-being, plaintiff had no impairments.  (Tr. 235-38).

On November 2, 2012, plaintiff met with Ms. Abboud and had a full affect and normal mood.  (Tr. 322).  Plaintiff played with boy and girl Barbies who "like each other" and went on a date; plaintiff had the dolls kiss, then they got in a car and went on a date.  Id.

On December 20, 2012, plaintiff met with Ms. Abboud and played with Barbie dolls; the play was sexual in nature.  (Tr. 323).  Plaintiff had a boy and girl Barbie kiss, then stated the girl Barbie needed to take her clothes off so the boy could "kiss her nip-nips."  Id.  She took the Barbie's clothes off, and then hurriedly put them back on.  Id.  Plaintiff and Ms. Abboud

discussed male and female private parts and reviewed good and bad touch.  Id.

On January 3, 2013, plaintiff met with Ms. Abboud and stated she "ripped" a picture of her father by accident and her father was not "mad."  (Tr. 324).  Plaintiff moved quickly from one topic to another.  Id.

On January 31, 2013, Ms. Abboud reported plaintiff's trauma symptoms have decreased and plaintiff appeared to be doing very well.  (Tr. 326).

On April 4, 2013, plaintiff met with Ms. Abboud; during the appointment, plaintiff took the toy police gun and handcuffs, walked up to her mother, and pointed the gun at her mother's face; plaintiff's mother became upset, and plaintiff pulled the gun away.  (Tr. 330).  Plaintiff shared that when her mother accidentally shot her father, she looked out the window, saw the police cars, got scared, and then went on an airplane far away.  Id.  Plaintiff became upset when leaving the appointment and apologized to her mother for pointing a gun in her mother's face, and plaintiff's mother reassured her she was not in trouble.  Id.

On April 18, 2013, plaintiff met with Ms. Abboud and had a full affect and normal mood; plaintiff played with three female dolls, pretending an "evil man" attacked the girls' home, and the girls had to fight him off.  (Tr. 334).

On April 25, 2013, plaintiff met with Ms. Abboud and was joined by her mother and sister; plaintiff had a normal mood and full affect, and Ms. Abboud noted plaintiff's mother continues to support plaintiff in treatment when needed.  (Tr. 336).

On June 14, 2013, plaintiff met with Ms. Abboud and recounted a scary dream wherein plaintiff was screaming for "Daddy to stop!"  (Tr. 340).  Ms. Abboud helped normalize this dream regarding plaintiff's trauma history.  Id.

On July 11, 2013, plaintiff and her sister had a meeting with Ms. Abboud to

address recent physical altercations between plaintiff and her sister, including an altercation that involved a knife.  (Tr. 343).  Ms. Abboud explained it is ok to be angry and upset, but it is important to be safe when those feelings arise.  Id.

On July 18, 2013, plaintiff told Ms. Abboud "daddy is going to execute me."  (Tr. 344).  Plaintiff's mother stated plaintiff was referring to a statement plaintiff's father made about sexual abuse; plaintiff's mother did not want plaintiff using the term "sexual abuse" in public, so they chose the term "execute" instead.  Id.  Plaintiff stated she did not know what either term meant.  Id.  Ms. Abboud discussed the difference between a good and a bad touch, such as a hug, handshake, or punch.  Id.  During the session, plaintiff switched from being verbal and engaged to highly avoidant and anxious.  Id.  Ms. Abboud opined plaintiff was suffering from confusion over the ongoing conflict between her parents.  Id.

Plaintiff met with Ms. Abboud on July 31, 2013, and plaintiff's mother was very upset at the start of the session, because plaintiff and her sister got into a physical fight on the way to the appointment, resulting in scratches on both girls' faces.  (Tr. 347).  When Ms. Abboud tried to talk to plaintiff about the incident, plaintiff began singing very loudly and tried to hand Ms. Abboud play money stating, "I will give you $80 million if you stop talking."  Id.  Ms. Abboud opined the favoritism plaintiff's father shows to plaintiff's sister is fueling negative feelings between the girls.  Id.

On August 27, 2013, Ms. Abboud opined plaintiff appeared to be avoidance at recent therapy sessions and did not want to share feelings.  (Tr. 349).

On September 27, 2013, plaintiff met with Ms. Abboud, and Ms. Abboud opined plaintiff continued to struggle with the effects of the reported domestic violence between plaintiff's parents; plaintiff was engaged and had a full affect and normal mood.  (Tr. 351).

11

On October 10, 2013, Ms. Abboud noted plaintiff continued to engage in physical conflict with her older sister, and plaintiff's mother had a lot of difficulty managing these behaviors and conflicts.  (Tr. 353).  Ms. Abboud opined plaintiff would likely benefit from Family Based services.  Id.

On October 17, 2013, plaintiff met with Ms. Abboud; Ms. Abboud asked plaintiff about plaintiff's father having been in their home, and plaintiff stated "you can't talk about that," because plaintiff would get in trouble for talking about her mother's business.  (Tr. 354). Plaintiff told Ms. Abboud that her father had been at their home, had done the laundry, and had "slept in bed" with plaintiff.  Id.  Plaintiff asked Ms. Abboud not to say anything, because plaintiff would get in trouble.  Id.

On November 7, 2013, Ms. Abboud opined that due to plaintiff's family's high level of need, the family should participate in Family Based services.  (Tr. 357).

On November 14, 2013, plaintiff met with Ms. Abboud and had a full affect and normal mood; Ms. Abboud opined plaintiff did not appear to be struggling with any trauma-related symptoms.  (Tr. 359).  Rather, Ms. Abboud opined plaintiff's mother's ongoing difficulties with managing her own trauma history and its impact on her ability to effectively parent plaintiff is plaintiff's biggest barrier to progress.  Id.

On November 21, 2013, Ms. Abboud explained to plaintiff that plaintiff would be taking a break from meeting with Ms. Abboud, and plaintiff would begin meeting with a Family Based services team to support plaintiff and her family in the home.  (Tr. 360).  Plaintiff did not respond to the news that she would no longer be meeting with Ms. Abboud.  Id.  Ms. Abboud noted plaintiff and her sister could be re-referred anytime once stabilization occurred.  (Tr. 361).

Continuing with the three-step sequential evaluation, at step three, the ALJ found

12

plaintiff did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the severity of the listings in 20 C.F.R. § 416.924(d) and 416.926(a). (Tr. 18).  The ALJ considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. (Tr. 19).  Further, the ALJ considered opinion evidence.  <u>Id.</u>

The ALJ determined that while plaintiff had medically determinable impairments that could reasonably be expected to produce the alleged symptoms, the statements concerning the intensity, persistence, and limiting effects of these symptoms do not result in a finding that plaintiff's impairment functionally equals the listings.  <u>Id.</u>

The ALJ determined plaintiff had not been under a "disability," as defined in the Act, since August 17, 2012.  (Tr. 11-25).

IV.    PLAINTIFF'S CONTENTIONS

Plaintiff argues: (i) the ALJ committed reversible error by not finding a "marked," if not "extreme," limitation in the domain of interacting and relating with others; and (ii) the ALJ committed reversible error by not finding a "marked" limitation in the domain of caring for yourself.

V.    DISCUSSION

A.  <u>Whether the ALJ Committed Reversible Error by not Finding a "Marked," if not "Extreme," Limitation in the Domain of Interacting and Relating With Others</u>

Plaintiff argues the ALJ erred in finding plaintiff had a "less than marked" limitation in the domain of interacting and relating with others.  <u>See</u> Pl. Brief at 9.  In support of her argument, plaintiff states evidence in the record shows plaintiff (i) had outbursts and physical altercations with her sister, (ii) hit other children and could not play with children her own age, (iii) pointed a toy gun at Ms. Abboud, (iv) played with dolls in a sexual manner, and (v)

13

frequently had to save her dolls from a "bad man." See id. at 11-13. As such, plaintiff states the ALJ's determination was not supported by substantial evidence, because plaintiff had a "marked" or "extreme" limitation in this area. See id. at 9. In response, the Commissioner argues substantial evidence supported the ALJ's determination. See Def. Reply at 4-6. For the reasons that follow, we find the ALJ's determination was not supported by substantial evidence.

An impairment functionally equals the listings at step three if it results in "marked" limitations in two (2) domains of functioning or an "extreme" limitation in one (1) domain. 20 C.F.R. § 416.926a(a). The six domains of functioning to be considered in this evaluation are: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A "marked" limitation in a domain will be found "when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation also means a limitation that is "more than moderate" but "less than extreme." Id. An "extreme" limitation in a domain will be found "when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation is "more than marked" but does not necessarily mean a total lack or loss of ability to function. Id.

When analyzing the domain of interacting with and relating to others, an ALJ considers how well a claimant can "initiate and sustain emotional connections with others, develop and use the language of [his or her] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). The regulations note that a claimant of plaintiff's age should be able to socialize

with children as well as adults; begin to prefer playmates her own age and develop friendships with children her age; use words instead of actions to express herself; be better able to share, show affection, and offer to help; relate to caregivers with increasing independence; choose friends and play cooperatively with other children; initiate and participate in conversations; use increasingly complex vocabulary and grammar; and speak clearly so listeners can understand. See id. § 416.926a(i)(2)(iii).

Here, the ALJ determined plaintiff had a less than marked limitation in the domain of interacting with and relating to others.  (Tr. 22).  The ALJ stated:

> [Plaintiff's] mother has reported that [plaintiff] throws violent temper tantrums and that she has difficulty getting along with other[] children, including her siblings.  At the November 2012 consultative examination, [plaintiff] was recorded as being cooperative and appropriate in responding to the examiner.  In this domain, the record supports the finding of the State agency childhood disability evaluation that [plaintiff] has a less than marked limitation.

Id.

For the reasons that follow, we find the ALJ's determination was not supported by substantial evidence, because the ALJ failed to acknowledge or discuss relevant evidence during the time period at issue.  Plaintiff had weekly therapy sessions with Ms. Abboud, wherein Ms. About noted: (i) on April 23, 2012, plaintiff was aggressive and appeared angry prior to her session; (ii) on September 24, 2012 plaintiff engaged in play but appeared anxious and had difficulty sharing her thoughts and feelings; (iii) on October 19, 2012, plaintiff had a somewhat restricted affect, a variable mood, and she used police toys to handcuff Ms. Abboud and point a gun at Ms. Abboud's head and face; plaintiff's mood later shifted, and plaintiff stated "I don't want to be the shooter . . . I am sad;" (iv) on April 4, 2013, plaintiff took the toy police gun and handcuffs, walked up to her mother, and pointed the gun at her mother's face; plaintiff later became upset and apologized to her mother; (v) on July 11, 2013, plaintiff and her sister had a

meeting with Ms. Abboud to address recent physical altercations between plaintiff and her sister, including an altercation that involved a knife; (vi) on July 31, 2013, plaintiff and her sister got into a physical altercation on the way to meet with Ms. Abboud, resulting in scratches on both girls' faces; (vii) on August 27, 2013, plaintiff appeared to be avoidance at recent therapy sessions and did not want to share feelings; (viii) on September 27, 2013, Ms. Abboud opined plaintiff continued to struggle with the effects of the reported domestic violence between plaintiff's parents; and (ix) on October 10, 2013, Ms. Abboud noted plaintiff continued to engage in physical conflict with her older sister, and plaintiff's mother had a lot of difficulty managing these behaviors and conflicts.  (Tr. 317, 319, 330, 334, 347, 349, 353).  Moreover, on November 1, 2012, Dr. Schwartz, the consultative examiner, opined plaintiff tended to isolate herself and would become aggressive with peers.  (Tr. 236). The ALJ failed to acknowledge, discuss, or weigh this evidence.

The Third Circuit "has long been concerned with ALJ opinions that fail properly to consider, discuss and weigh relevant medical evidence."  Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).  "An ALJ may not reject pertinent or probative evidence without explanation." Johnson v. Comm. of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008).  Therefore, the Third Circuit has held an "ALJ's failure to explain his implicit rejection of [] evidence or even to acknowledge its presence [is] error."  Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

It is the function of the ALJ, not the courts, to evaluate evidence.  Because it is not clear that the above-referenced evidence would have no bearing on the outcome of the case, we find remand is appropriate to give the ALJ a further opportunity to properly analyze, and expressly address, the relevant records regarding the domain of interacting with and relating to others.  See Fargnoli, 247 F.3d at 42, 44 n.7 (explaining district court cannot attempt to rectify

16

"ALJ's failure to consider all of the relevant and probative evidence"); <u>Rutherford</u>, 399 F.3d at 553.

    B.  <u>Whether the ALJ Committed Reversible Error by not Finding a "Marked" Limitation in the Domain of Caring for Yourself</u>

Plaintiff argues the ALJ erred in finding plaintiff had a less than marked limitation in the domain of caring for yourself, rather than a marked limitation in said area. <u>See</u> Pl. Brief at 15-16. In support of her argument, plaintiff states she has engaged in grossly age-inappropriate behavior impacting upon the domain, as discussed in claim one. Moreover, plaintiff notes on several mental status examinations, her mood was "mad" or "variable," her affect was "constricted," and plaintiff often indicated she was scared of her father. <u>See</u> <u>id.</u> at 16-17. In response, the Commissioner states substantial evidence supported the ALJ's determination. Def. Reply at 10-12. For the reasons that follow, we find substantial evidence supported the ALJ's determination, and we recommend this claim be denied.

With regard to the domain of caring for yourself, an ALJ considers how well a claimant maintains a healthy emotional and physical state, including how well the claimant gets her physical and emotional wants and needs met in appropriate ways and copes with stress. <u>See</u> <u>id.</u> § 416.926a(k). The regulations note that a claimant of plaintiff's age should be able to take care of physical needs (i.e. putting on shoes and getting a snack); try doing things she cannot do fully; and begin to understand how to control behaviors that are not good for her (i.e. crossing the street without an adult). <u>See</u> <u>id.</u> § 416.926a(k)(2)(iii).

Here, the ALJ determined plaintiff had a less than marked limitation of function in the ability to care for herself. (Tr. 24). The ALJ stated:

    [Plaintiff's] mother testified that [plaintiff] wets the bed at night and has accidents during the day. At the November 2012 consultative examination, [plaintiff's] mother stated that [plaintiff] was able to wash her own face, brush her teeth, and

get dressed independently.  In this domain, the record supports the finding of the State agency childhood disability evaluation that [plaintiff] has a less than marked limitation.

Id.

Here, we find the ALJ's determination that plaintiff had a less than marked limitation in caring for herself was supported by substantial evidence in the record.  As the ALJ noted, plaintiff could wash her own face, brush her teeth, and get dressed on her own.  Id. Moreover, Dr. Schwartz opined plaintiff's self-care skills were "age appropriate" but plaintiff may hurt others when upset, as detailed in claim one.  (Tr. 237).  Plaintiff does not point to additional evidence in the record tending to show the ALJ failed to adequately support his determination that plaintiff had a less than marked limitation in this domain, and as such, we recommend claim two be denied.

Therefore, we make the following:

## RECOMMENDATION

AND NOW, this 27th day of February, 2017, it is RESPECTFULLY RECOMMENDED that Plaintiff's Request for Review be GRANTED, and the case remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

BY THE COURT:


 /s/ LINDA K. CARACAPPA
LINDA K. CARACAPPA
UNITED STATES CHIEF MAGISTRATE JUDGE

18